**NATIONAL METAL & STEEL CORP., Plaintiff,**

v.

**Robert REICH, Secretary of Labor of the United States,[1] Defendant.**

**Civ. A. No. HAR 90–2267.**

United States District Court,
D. Maryland.

May 24, 1994.

Thomas X. Glancy, Jr., Nancy F. Paige, Gordon, Feinblatt, Rothman, Hoffberger and Hollander, Baltimore, MD, for plaintiff.

Larry D. Adams, Asst. U.S. Atty., Baltimore, MD, Joshua T. Gillelan, II, U.S. Dept. of Labor, Office of the Solicitor, Washington, DC, for defendant.

### *MEMORANDUM OPINION*

HARGROVE, Senior District Judge.

The Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901, *et seq.*, (the "LHWCA" or "Act") establishes a detailed and comprehensive workers' compensation scheme for maritime employees. The Act places liability on maritime employers for compensating injuries that occur on the navigable waters of the United States regardless of fault as a cause of the injury. 33 U.S.C. §§ 903 and 904. Maritime employers must secure the payment of compensation by contracting with an insurance company or by seeking authorization to self-insure. 33 U.S.C. §§ 904 and 932.

---

1. The Court notes that Plaintiff originally named as Defendant in the above-captioned action Elizabeth Dole, United States Secretary of Labor at the time the case was filed. The Court has substituted Robert Reich, the current United States Secretary of Labor, as the named Defendant.

■ A subset of these compensable injuries is assumed by a Special Fund, which relieves employers of liability for a portion of compensation payments when employees with preexisting disabilities suffer "second injuries." 33 U.S.C. § 908(f). The Special Fund is intended to encourage employers to hire employees with preexisting disabilities. Funding for the Special Fund depends principally on assessments that the United States Secretary of Labor (the "Secretary") imposes on "each carrier and self-insurer" covered by the Act. 33 U.S.C. § 944(c)(2). Plaintiff National Metal & Steel Corporation ("National Metal") filed this declaratory judgment suit against the Secretary pursuant to 28 U.S.C. §§ 2201 and 2202 seeking a declaration of its obligations under the LHWCA after it terminated employment of its maritime employees and authorization to self-insure. 33 U.S.C. § 944(c)(2).

Presently before the Court are cross-motions for summary judgment. The Court has reviewed the parties' memoranda and exhibits and will resolve the pending motions without convening a hearing. Local Rule 105.6 (D.Md.). For the reasons set forth in this memorandum opinion, the Court will grant summary judgment in favor of the Secretary.

### Facts

National Metal operated a ship dismantling and scrap metal export stevedoring business in Los Angeles, California until January 1, 1986. National Metal lost the lease on its Los Angeles harbor facility as of that date, and thereafter ceased its ship dismantling and stevedoring activities and discharged its maritime workers.

While in business, National Metal received authorization to self-insure its compensatory obligations under the LHWCA. Subsequent to terminating its employment of maritime workers, National Metal informed the United States Department of Labor ("DOL") that it no longer required authorization to self-insure. By letter dated March 17, 1986, the DOL terminated National Metal's self-insurance authorization, effective that date.

As a self-insurer under the LHWCA, National Metal contributed to the Special Fund. After National Metal's authorization to self-insure terminated, the DOL continued to impose assessments on it to support the Special Fund. National Metal continued to pay all contributions assessed against it up to and including payment on August 29, 1989. National Metal made that last payment, however, "under protest."

According to the Affidavit of John Martone, Branch Chief, Branch of Insurance, at the DOL, from February 28, 1986 through August 11, 1989, National Metal paid assessments totalling $142,282.00. The amount of the 1989 final assessment is $57,483.77, and the amount of the preliminary assessment for 1990 is $27,770.41, neither of which National Metal has paid. National Metal does not dispute these amounts.

### Discussion

The LHWCA requires every employer to secure the payment of compensation to its employees for injuries arising during the course of employment. 33 U.S.C. § 904. The Act applies to "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States." 33 U.S.C. § 902(4). The liability of the employer to secure compensation is exclusive and supplants the right of an injured employee to recover damages from it at law or in admiralty for such injury or death. 33 U.S.C. § 905. Every employer must secure the payment of compensation by insuring such payment with a company that is authorized by law to insure workers' compensation, also known as a "carrier," or by receiving authorization from the Secretary to pay such compensation directly, thereby becoming a "self-insurer." 33 U.S.C. §§ 932(a)(1) and 932(a)(2).[2]

Compensation for a subset of workers' injuries stems from a Special Fund. To encourage employers to hire individuals with preexisting disabilities, the LHWCA limits the direct compensation that employers must provide to employees who suffer "second injuries" that exacerbate their preexisting disabilities. In these "second injury" cases, employers must provide direct compensation benefits to injured employees or their surviv-

---

2. By definition, the term "carrier" includes self-insurers. 33 U.S.C. § 902(5).

ors for a maximum of one hundred and four weeks. 33 U.S.C. § 908(f)(1). After this mandatory period of direct employer compensation has ended, the Act directs that a Special Fund compensate the employee or his survivor for the remainder of his benefits. 33 U.S.C. § 908(f)(2); 33 U.S.C. § 944. The Special Fund shall not assume responsibility, however, for compensating an injured employee whose employer fails to secure the payment of compensation. 33 U.S.C. § 908(f)(2).

In 1984, Congress amended the assessment formula used to finance the Special Fund to more accurately correlate the benefit that each employer derived from the Special Fund's assumption of compensation in second injury cases to its cost.[3] The bulk of funding for the Special Fund currently derives from prorated assessments that the Secretary imposes against each carrier and self-insurer based on the amount of direct compensation each participant has paid and the amount of benefits that the Special Fund has disbursed on its behalf. 33 U.S.C. § 944(c)(2).[4] Under the new assessment formula, an employer's contribution to the Special Fund depends directly on the amount of benefit it receives from the assumption of payments by the Special Fund. The new formula thus employs an employer's actual *use* of the fund to calculate its assessment rate.

Both parties have moved for summary judgment on the legal question of whether the LHWCA imposes an ongoing obligation on a carrier or self-insurer to contribute to the Special Fund after an employer has terminated its business and authorization to insure. National Metal contends that the termination of its employment of maritime workers, and consequently its authorization to self-insure, released its obligation to contribute to the Special Fund because the Act explicitly imposes assessments on "each carrier and self-insurer." 33 U.S.C. § 944(c)(2). Because it is no longer a "self-insurer," National Metal reasons that the assessment formula no longer applies to it. The Secretary asserts, in contrast, that termination of the authorization to self-insure ends only the employer's privilege of operating as a *current* self-insurer; it has no effect on the liabilities arising out of its prior conduct of maritime employment, which give rise to future assessments. According to the Secretary, National Metal's obligation to contribute to the Special Fund continues as long as it reports direct compensation payments under the Act and by the Special Fund. 33 U.S.C. § 944(c)(2).

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Con-

---

**3.** The legislative history of the 1984 LHWCA Amendments reveals Congress's deep concern with the escalating growth of obligations that the Special Fund had assumed in second injury cases. H.R.Rep. No. 570, 98th Cong., 2nd Sess. 20–21, *reprinted in*, 1984 U.S.C.C.A.N. 2734, 2753–54 (hereinafter cited as "1984 U.S.C.C.A.N."). Because the original assessment formula rested on the ratio of direct compensation that a particular carrier or self-insurer paid to the total of such direct payments that all carriers and self-insurers made, the formula encouraged employers to refer disability cases into the Special Fund. "Dumping" these cases thereby decreased their payment of direct compensation to injured employees without increasing their assessment rate. In fact, "dumping" cases into the Special Fund actually decreased an employer's assessment rate by decreasing the amount of its direct compensation. Congress sought to increase the employer's financial stake in second injury claims in order to curb the dramatic growth of the Special Fund's obligations. 1984 U.S.C.C.A.N. at 2753. It thus

proposed to adopt a new assessment formula to ensure that the Fund received adequate financing. 1984 U.S.C.C.A.N. at 2781.

**4.** The Secretary determines the amount each carrier and self-insurer must contribute to the Special Fund by calculating, as percentages: (1) the ratio of the total amount of compensation that each carrier paid during the prior calendar year to the total amount of compensation that all carriers paid during that period; and (2) the ratio of the total amount of § 908(f) payments by the Special Fund attributable to the particular carrier during the prior calendar year to the total amount of § 908(f) payments that the Special Fund disbursed during that period. The Secretary then adds the two percentages together, divides the sum by two, and multiples the resulting percentage by the estimated probable expense of the Fund during the upcoming calendar year. The resultant figure is the amount of the assessment that each carrier must pay to the Special Fund. 33 U.S.C. § 944(c)(2).

gress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron United States, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (footnotes omitted).

National Metal contends that the Act is clear. According to National Metal, the absence of any language in the LHWCA specifying that liability for assessments continues after an employer has terminated its employment of maritime workers and its authorization to self-insure means that its responsibility to contribute to the Special Fund ended when its business and authorization to self-insure ended. In support of this argument, National Metal submits that when Congress intended liability to be ongoing, it clearly specified that requirement. Section 32 of the Act, for example, specifically provides that the suspension or revocation of the authority to any carrier to secure payment of compensation "shall [not] affect the liability of any carrier already incurred." 33 U.S.C. § 932(b). That section thus requires a carrier, and by extension a self-insurer, to remain liable to pay compensation for covered employment injuries even after it has terminated its employment of maritime workers and authorization to insure. According to National Metal, the language of § 32 aptly demonstrates Congress's ability to clearly specify a carrier's or self-insurer's continuing liability when it intended that scenario. National Metal submits that Congress could have declared that the obligation to pay assessments was co-extensive with the payment of compensation for covered employment or with the payment Special Fund benefits attributable to employees covered by the carrier, or both. However, the assessment formula applies to "each carrier and self-insurer." Because National Metal no longer fits into either category, it asserts that the formula no longer applies to it.

In response, the Secretary contends that the import of the absence of a specific reference to whether the obligation to contribute to the Special Fund continues despite the termination of employment and authorization to self-insure is unclear without reference to supporting legislative history. Furthermore, the Secretary alleges that the same provision, LHWCA § 32, supports its proposition that the obligation to contribute to the Special Fund is ongoing. According to the Secretary, an employer incurs liability for future assessments when a job-related injury befalls an employee with a preexisting injury. Therefore, although the Secretary imposes a specific amount of contribution to the Special Fund on each carrier each year, the liability for such contribution is already "incurred," if not yet "accrued," and LHWCA § 32(b) protects that preexisting liability from discharge.

The attempt by each party to construe LHWCA § 32 in its favor aptly demonstrates the potential ambiguity of the statutory language on the question of whether the obligation to contribute to the Special Fund survives the termination of authorization to self-insure. After conducting an independent, thorough review of each provision of the LHWCA and its accompanying legislative history, the Court has determined that nowhere in the Act itself, or in the relevant legislative history pertaining to the 1984 Amendments to the LHWCA, which modified the assessment formula used to finance the Special Fund, does any specific reference exist to the effect that termination of authorization to self-insure has on the obligation to pay assessments. *See* 33 U.S.C. §§ 901, *et seq.;* H.R.Rep. No. 570, 98th Cong., 2nd Sess. 20–21, *reprinted in,* 1984 U.S.C.C.A.N. 2734, 2753–54.

■ A review of the agency regulations that relate to the LHWCA proves equally unhelpful in ascertaining whether the assessment formula applies to former self-insurers. Nowhere in the agency regulations, codified

at 20 C.F.R. §§ 701.101, *et seq.,* does any reference exist to the precise definition of "self-insurer," and whether the obligation to pay assessments to finance the Special Fund endures despite the termination of an employer's business, and hence its authority to self-insure. *See generally* 20 C.F.R. §§ 701.101, *et seq.* Section 703.312 discusses the power of the Office of Workers' Compensation Programs in the Department of Labor to suspend or revoke the authorization of any self-insurer for good cause, but lacks any reference to the effect of such action on the self-insurer's liability for assessments. 20 C.F.R. § 703.312.[5]

The only reference to the significance of the new assessment formula exists in 20 C.F.R. § 702.148, which grants insurance carriers and self-insured employers the authority to monitor their claims in the Special Fund. This increased authority is described as "consistent with their greater direct liability stemming from the amended assessment formula." 20 C.F.R. § 702.148(b). The language of this regulation suggests that the assessment formula is simply one facet of an employer's direct liability to compensate maritime workers for job-related injuries.

■ National Metal repeatedly emphasizes that because it no longer employs maritime workers, it is no longer an "employer," as defined by the LHWCA. The Court finds that this rigid construction of the statutory term, however, is untenable. Although the Congress fashioned the Act to refer to the duty of an "employer," nowhere did it limit the definition of that term, or the obligations imposed as a result of that status, to one who is currently employing workers engaged in maritime activities. Indeed, to adopt such a limitation would emasculate the import of the Act. Section 5(a) of the LHWCA, for exam-

ple, provides an employer with immunity from tort liability if the employer has secured the payment of compensation. Although the language of § 5(a) refers to "[t]he liability of an employer," that immunity continues even after an employer terminated its business. To construe that section according to National Metal's strict definition of "employer," however, would strip away that tort immunity from an employer once it ceased operation, thereby engendering a flurry of lawsuits to displace the careful scheme of workers' compensation for maritime employees that Congress established in the LHWCA. That result is incongruous with the Act's purpose of removing the issue of workers' compensation from the courts to ensure that maritime workers receive compensation for job-related injuries.

The parties have not submitted any case law which addresses this precise issue, and the Court's independent research has not yielded any relevant precedent. Therefore, this Court must apply the obligations that the LHWCA imposes in a manner that is consistent with the general purpose of the statute, that is, to ensure that injured maritime employees receive compensation for injuries suffered during the course of their employment. The Act's extensive coverage for job-related injuries regardless of fault as a cause of injury further underscores its remedial nature. A corollary of that goal, as the amended assessment formula indicates, is to increase the financial stake of carriers in second injury claims.

National Metal attempts to reap the ongoing benefits that the LHWCA provides while minimizing the continuing obligations the Act imposes. The goal of the LHWCA is to provide a comprehensive scheme of workers' compensation to maritime employees. The

**5.** The Secretary urges this Court to defer to its reasonable administrative construction of the operation of the Special Fund pursuant to the analysis set forth in *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83. National Metal correctly points out, however, that no written "administrative construction" exists regarding the issue raised in this case. Nothing in the applicable regulations addresses the liability of former carriers and self-insurers to contribute to the Special Fund, and no written policy exists regarding the status of employers who have terminated

covered employment. Instead, the Secretary simply relies on its practice of continuing to charge assessments after the termination of self-insurance or carrier authorization, and its reported continued receipt of such assessments, to support its position. Less deference is due to agency positions that are developed in informal proceedings or litigation than to the results of formal rulemaking. *See Martin v. OSHRC,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).

Special Fund is simply one small facet of this overall system of compensation. National Metal recognizes its ongoing obligation to directly compensate employees for injuries suffered during the course of their employment. It attempts to create an ambiguity in the Act, however, by unilaterally parsing out the portion of compensation payments that the Special Fund assumes from the overall scheme of compensation for which the employer is directly liable to the injured employee, and then elevating that provision to create two completely separate and independent compensation systems. National Metal, however, cannot create an ambiguity where none exists. The Special Fund helps employers to compensate injured employees; it does not absolve them from liability.

### *Conclusion*

Therefore, the Court finds that an employer's obligation to compensate maritime employees for job-related injuries continues after it has terminated its business whether that compensation flows directly from the carrier or self-insurer, or from the Special Fund. Thus, the assessment formula used to finance the Special Fund applies to current and former carriers and self-insurers. Summary judgment will be granted in favor of the Secretary. It will be so ordered.